**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LAWANDA CARPENTER,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF PITTSBURGH MEDICAL CENTER and UPMC Center for HIGH-VALUE HEALTHCARE,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:24-cv-00038<br><br><br>Judge Robert J. Colville |

**MEMORANDUM OPINION**

Robert J. Colville, United States District Judge

Before the Court is a Motion for Summary Judgment (ECF No. 51) filed by Defendants in this matter. Defendants University of Pittsburgh Medical Center ("UPMC") and UPMC Center for High-Value Healthcare ("UPMC HVH" and, together with UPMC, "Defendants") move for summary judgment on all four counts in the Amended Complaint (ECF No. 14) filed by Plaintiff Lawanda Carpenter ("Plaintiff"). The Court has subject matter jurisdiction to rule on this matter pursuant to 28 U.S.C. § 1331. The Motion has been fully briefed and is ripe for disposition.

## I. Factual Background & Procedural History

Unless otherwise noted, the following facts are not in dispute:

Plaintiff is an African American woman over the age of fifty. ECF No. 59, Plaintiff's Counter Statement of Facts ("PSF") ¶ 1; ECF No. 70, Defendant's Response to Plaintiff's Counter Statement of Facts ("Def. Resp. PSF") ¶ 1. In January 2020, Plaintiff began working for UPMC as a temporary project analyst, filling in for Adelina Malito while she was on maternity

leave. ECF No. 53, Defendant's Concise Statement of Material Facts ("DSMF") ¶ 2; ECF No. 58, Plaintiff's Response to Concise Statement of Material Facts ("Pl. Resp. DSMF") ¶ 2; PSF ¶ 5, ECF No. 70; Def. Resp. PSF ¶ 5. Plaintiff became a full-time employee in July 2020, and in January 2021, her position was transferred to UPMC HVH, with no change to her duties or terms and conditions of her employment. DSMF ¶¶ 2–3, PL. Resp. DSMF ¶ 2–3. Plaintiff's duties involved data collection, research, creating presentations, computer work, manuscript writing, and spreadsheet analysis. DSMF ¶ 2.

Kelly Williams, UPMC's director of research design and implementation, helped hire Plaintiff and served as her supervisor. DSMF ¶ 4. Plaintiff testified that Williams was an "awesome manager," who treated her fairly. DSMF ¶ 4, Pl. Resp. DSMF ¶ 4. She further testified that no supervisor, employee, or human resources representative ever said anything to her suggesting bias on account of her race, color, or age, but qualified this testimony, claiming it was a reference to the lack of negativity from employees and representatives of Defendant respecting Plaintiff's cancer journey. DSMF ¶¶ 5–6, Pl. Resp. DSMF ¶ 5–7.

In October 2022, Plaintiff was diagnosed with an aggressive form of breast cancer and began a leave of absence from work. DSMF ¶ 8–9, PSF ¶ 18. Kevin Conley, a specialist at WorkPartners, a UPMC-affiliated entity that administers employee requests for disability leave accommodations, was assigned to oversee Plaintiff's leave. DSMF ¶ 10–12. WorkPartners approved both FMLA leave and short-term disability benefits for Plaintiff from the first day of her leave of absence. Her FMLA leave would last through January 2023 and her disability benefits through April 2023. DSMF ¶ 11.

In November 2022, during cancer treatment, Plaintiff had an adverse reaction to one of her infusions and was recorded intolerant to it, and a November 2022 Covid-19 diagnosis led to

cancelation of a chemotherapy cycle. PSF ¶ 20, Def. Resp. PSF ¶ 20. A grievance investigator later noted that Plaintiff "had treatment which she then had an allergic reaction to, and this ended up altering her treatment plan/surgery schedule." PSF ¶ 20. On December 5, 2022, Plaintiff's oncologist submitted an attending physician statement to WorkPartners, stating that Plaintiff was not yet released to return to work, and estimated her return in six months, and another physician statement stating the same followed in January 2023. DSMF ¶¶ 13–14. Because Plaintiff's FMLA leave ended that month, WorkPartners advised her to request accommodations under the ADA in the form of continued leave, and her short-term disability leave continued. DSMF ¶ 15.

In February 2023, Plaintiff's attending physician sent another statement to WorkPartners recording Plaintiff's diagnosis, noting that she was awaiting surgery, and predicting six months as the estimated return to work date. PSF ¶¶ 30–31, Defs. Resp. PSF ¶¶ 30–31. Defendants characterize this statement as suggesting Plaintiff would not return for at least six months; while Plaintiff points out that the statement from her doctor simply states that the "[e]stimated date that the patient will be released to return to work in any capacity" was in "6 months." ECF No. 65-14, Pl. Ex. 21 at 5. Defendants' response to Plaintiff's Counter Statement of Material Facts also marks the claim that Plaintiff's attending physician indicated that Plaintiff would be released for work in approximately six months as "Undisputed." Def. Resp. PSF ¶ 31.

UPMC's Disability Accommodation Policy includes a provision that provides for consecutive accommodated time away from work ("ATW") after FMLA and short-term disability leave are exhausted. DSMF ¶ 21, PSF ¶ 23. An employee seeking ATW must advise the Leave Specialist assigned to their leave and provide "written documentation[] from his/her healthcare provider[] supporting the need for his/her extended leave," including the medical reason, "an anticipated timeframe for return to work," whether the employee is expected to return to her original or modified position, and an "ongoing treatment plan and anticipated duration of the

condition." Pl. Resp. DSMF ¶ 17, PSF ¶ 24, Def. Resp. PSF ¶ 24. Upon receiving the request, "WorkPartners will review all available medical information, including information already available in the current leave and short-term disability files to assist in making the determination of the need for additional time away from work." PSF ¶ 26, Def. Resp. PSF ¶ 26. Defendants claim that ATW "will only be approved if the employee's healthcare provider sends certain information, including an anticipated return-to-work date and an ongoing treatment plan." DSMF ¶ 21. Plaintiff claims that the policy calls for an anticipated timeframe rather than a specific date of return. Pl. Resp. DSMF ¶ 21. Defendants' policy does indeed provide that a request for ATW must include just "an anticipated timeframe for return to work." ECF No. 60-17 at 5. Plaintiff also contends that, based on Kevin Coley's testimony and an internal training flowchart guide, a request should be granted if the applicant provides either a return-to-work date or a treatment plan, not both, as Defendants claim. PSF ¶ 25, Def. Resp. PSF ¶ 25. The flowchart as described by Conley does provide that "an eight-week exhaustion letter/ADA plan" should be sent to an applicant "if the employee will return to work in the foreseeable future and/or has a recovery plan." ECF No. 65-12, Conley Dep. at 22–23. Defendants assert both are required and requests are considered on a case-by-case basis, rather than always granted when certain prescribed conditions are met. Def. Resp. PSF ¶ 25.

Plaintiff applied for ATW, and on March 9, 2023, WorkPartners wrote to Plaintiff about her request, indicating that she had not provided supporting documentation and asking her to submit an ATW form. DSMF ¶ 17, PSF ¶ 34. On March 22, 2023, Conley told Plaintiff that the attending physician statement received on February 28 had only been submitted for the purpose of short-term disability, not to support ATW. PSF ¶ 35, Def. Resp. PSF ¶ 35.

On March 20, 2023, Plaintiff applied for a "continuous leave of absence/leave extension." DSMF ¶ 19. Her oncologist completed the ATW form, and WorkPartners's records

show that Conley received the form on April 3, 2023. PSF ¶¶ 36–37, Def. Resp. PSF ¶¶ 36–37. The form asked, "What are the approximate dates that the employee will a require a continuous leave?" The answer given was a start date of March 24, 2023 and an end date of September 24, 2023, and the doctor wrote that Plaintiff was unable to return to work in any capacity over the course of those six months. PSF ¶ 38, Def. Resp. PSF ¶ 38, DSMF ¶ 24, ECF 65-17, AHN Fax to WorkPartners, at 7. In her own application, Plaintiff describes her condition as causing "[s]tress, low energy, . . . memory issues, often forgetful, unable to concentrate or think straight, confusion, blurry vision, extreme fatigue due to chemo, and sleep issues," among other symptoms. DSMF ¶ 22. She wrote that she was unable to work in any capacity, and Defendants contend that, when asked when she expected to be released to work, she answered "not sure." DSMF ¶ 23. Plaintiff disputes that she said "not sure," but in her deposition she confirmed it. ECF No. 55-2, Carpenter Dep. at 36.

On April 3, 2023, the day he received the ATW form from Plaintiff's doctor, Conley emailed UPMC HR Representative Kelly Nan and Plaintiff's supervisor Kelly Williams, advising that Plaintiff would be out of work until September 24, that this was not necessarily a foreseeable return to work date, and that he was not recommending job protection through ATW. PSF ¶ 43, Def. Resp. PSF ¶ 43. Conley, Nan, and Williams exchanged further emails on April 3 and 4 about Conley's recommendation, noting that it would cause Plaintiff to lose job protection immediately. PSF ¶ 45, Def. Resp. PSF ¶ 45. On or about April 4, 2023, Williams wrote in her reports that "[b]asically, [Plaintiff's] STD ends on 4/17. They are recommending that UPMC does not extend her leave through 9/24, which would mean that she would no longer be an employee as of 4/18." PSF ¶ 46, Def. Resp. PSF ¶ 46.

Conley testified that he thought it unusual that the return-to-work date was precisely six months after the start date, causing him to question whether it was a confirmed end date. DSMF ¶ 25, PSF ¶ 51, ECF No. 55-5, Conley Dep. at 11. On April 6, Conley called the oncologist's office and was told that there were complications with Plaintiff's treatment and that the six-month time frame was an estimate, which could change based on the nature of the complications. Pl. Resp. DSMF ¶ 28, PSF ¶ 49, Def. Resp. PSF ¶ 49, DSMF ¶ 26. Conley acknowledged that at the time he did not doubt that it could take six months for Plaintiff to recover completely and that he did not question whether her treatment would be ongoing for an extended period. PSF ¶ 50, Def. Resp. PSF ¶ 50, ECF 65-12, Conley Dep. at 16. He also testified that WorkPartners had a specialized team that addressed the foreseeability of leave, and that he did not consult it. PSF ¶ 44, Def. Resp. PSF ¶ 44, ECF 65-12, Conley Dep. at 70–71.

After calling the oncologist, Conley wrote to Kelly Nan in HR and a UPMC attorney, Christian Minor, writing, "I wanted to follow up on our call from earlier today regarding Lawanda Carpenter and the ATW paperwork we received, which indicated a possible end date on September 24th. According to the nurse I spoke with, she advised that this is just an estimate about 6 months out, and that the employee may experience complications which could change her treatment and estimated return date. Hopefully that is the clarification that you were looking for regarding ending her job protection." PSF ¶ 52, Def. Resp. PSF ¶ 52.

Conley recommended denial, and later testified that Plaintiff's lack of foreseeable return date was his basis for that recommendation. DSMF ¶ 28, Pl. Resp. DSMF ¶ 28. He submitted his recommendation to Williams and Nan, with his entry in the leave report record from April 7, 2023 indicating that he "discussed ATW request with HR and dept. manager, confirming ATW

request not reasonable due to no foreseeable [sic] RTW date." PSF ¶ 53, Def. Resp. PSF ¶ 53, ECF No. 65-15 at 4.

Conley called Plaintiff that day to tell her he could not support the request for lack of an immediate or estimated return to work date. PSF ¶ 55, Def. Resp. PSF ¶ 55. He explained that short-term disability benefits would continue until April 17 and that she would receive payments thereafter through long-term disability. PSF ¶ 56, Def. Resp. PSF ¶ 56. Plaintiff inquired about how she would go about returning to work after her final chemotherapy session on April 27, and Conley told her that at that point he would be off the case and that she would have to discuss it with someone overseeing long-term disability. PSF ¶¶ 57–58. Conley did not tell Plaintiff that if she did not return to work by April 17, her employment would be terminated. PSF ¶ 61; Def. Resp. PSF ¶ 61.

On April 13, Plaintiff received two letters respecting her leave, one denying her ATW leave request and the other approving her short-term disability claim through September 24, 2023 (corrected to April 17, 2023) and indicating that she may be eligible for long-term disability ("LTD") thereafter. PSF ¶¶ 62–63, Def. Resp. PSF ¶¶ 62–63. On April 18, 2023, Plaintiff received a letter from Kelly Nan, informing her that time away was no longer protected and that her employment was terminated (classified as a "resignation due to failure to return from leave") as of April 18, 2023. DSMF ¶ 31, PSF ¶ 66.

That same day, Plaintiff filed a grievance, explaining that the reason for her termination, the lack of a confirmed return to work date, was not true, and that she had been scheduled for surgery in May 2023 and could foreseeably return to work between four and six weeks after surgery, beginning in June 2023. PSF ¶ 72, Def. Resp. PSF ¶ 72. She did not raise the issue of her race or age. DSMF ¶ 32. Defendants assert that in this appeal, Plaintiff claimed that "she

could not perform the essential functions of her job." DSMF ¶ 32, Def. Resp. PSF ¶ 72. By the Court's review of that document, Plaintiff did not say that she could not perform essential functions of her job beyond the fundamental premise of any request for sick leave that at the present moment the applicant is not well enough to work. ECF No. 52-2, Ex. T.

On April 20, 2023, Plaintiff discussed her termination with UPMC grievance investigator, Cristina Corigliano, during which Plaintiff explained that she had told Conley that she did not think she needed to be away until September, as she may be cleared to return within four-to-six weeks after surgery. PSF ¶ 76. Later that day, Plaintiff supplemented her grievance with Corigliano, specifically noting that her attending physician statement from February indicated that she was expected to return to work within six months of February 23, 2023. PSF ¶ 77.

On April 24, 2023, Corigliano spoke with Kelly Nan, indicating that because there is no foreseeable return to work date, HR could end Plaintiff's employment, and expressed concerns about setting a precedent of having an employee on sick leave for more than six months. PSF ¶ 78–79, Def. Resp. PSF ¶ 78–79. Corigliano testified that she understood Plaintiff's treatment plan to be uncertain, with additional procedures potentially needed, with shifting timing for appointments and procedures, so there was not a solid return to work date. DSMF ¶ 34, Pl. Resp. DSMF ¶ 34. She also testified that she did not understand why Plaintiff's return to work date was not foreseeable. PSF ¶ 80, Def. Resp. PSF ¶ 80.

In a form letter dated April 26, 2023, Corigliano upheld Plaintiff's termination, stating that the "action taken was appropriate under the circumstances." PSF ¶¶ 81–84, ECF No. 65-37. On May 3, 2023, Plaintiff appealed the decision, and in her appeal argued that under the ADA, a cancer patient does not need to supply a fixed return date and can instead provide an estimate.

PSF ¶¶ 92–93. On May 12, Nan emailed a senior HR director, Tiffany Mikesic, to summarize the matter and noted that she had told Plaintiff that she was eligible for rehire once she was able to return to work. PSF ¶ 96, Def. Resp. PSF ¶ 96. On May 26, 2023, Senior Vice President of Regulatory Affairs, Health Policy, Government Relations, and Chief Legal Officer Sheryl Kashuba denied Plaintiff's appeal, again stating that the "action taken was appropriate under the circumstances." PSF ¶ 98.

In February 2023, UPMC HVH posted a project analyst position online, and Plaintiff received a LinkedIn alert about the posting. PSF ¶¶ 33, 103, Def. Resp. PSF ¶¶ 33, 103. On April 4, 2023, Kristie Mak was hired at HVH for a project analyst position in the UPMC Health Plan business unit. PSF ¶¶ 47, 103, Def. Resp. PSF ¶¶ 47, 103. Defendants acknowledge these facts, but they do not concede that Mak was hired by Plaintiff's manager or worked for Plaintiff's team. Def. Resp. PSF ¶ 47. Defendants' answer to an interrogatory places Ms. Mak at 25 years old at the time of her hire and states that she self-identifies as Asian. PSF ¶ 47, ECF No. 60-29 at 8.

Separately, in May 2023, UPMC HVH received approval to backfill Plaintiff's position and posted the position. DSMF ¶ 48. It selected Regina Brecker to fill the position, but before she was hired, funding for the position was cancelled, and the position went unfilled at least until the winter of that year. DSMF ¶ 49, PSF ¶ 102, Def. Resp. PSF ¶ 102.

Plaintiff identifies three employees outside her protected class, who, she alleges, were treated more favorably under the circumstances. Adelina Malito, Anna Patterson, and Kelly Williams each took a continuous leave and returned to her position. DSMF ¶¶ 50 –51, Def. Resp. PSF ¶ 13. Malito was on leave from November 15, 2022 until February 13, 2023, and had taken an earlier leave, the maternity leave Plaintiff was originally hired to cover for, from about

January 30, 2020 until April 23, 2020. Pl. Resp. DSMF ¶ 51, ECF No. 55-1, Phillabaum Decl. ¶ 5. Williams took maternity leave from August 13, 2021 until November 5, 2021. PSF ¶ 17, Def. Resp. PSF ¶ 17, DSMF ¶ 51, ECF 55-2 and 43.

On or about April 18, 2023, Plaintiff transitioned to long-term disability benefits under a policy insured by New York Life. DSMF ¶ 36, PSF ¶ 67. The policy defined disability as being "unable to perform the material duties of your Regular Occupation," and defines "Regular Occupation" as "[t]he occupation you routinely perform at the time the Disability begins," evaluated by "the duties of the occupation as it is normally performed in the general labor market in the national economy," adding that "[i]t is not work tasks that are performed for a specific employer or at a specific location." PSF ¶ 70, Def. Resp. PSF ¶ 70. Plaintiff received those benefits until August 31, 2024. DSMF ¶ 37.

On April 28, 2023, Plaintiff completed unemployment compensation paperwork, which she later withdrew. DSMF ¶ 38, PSF ¶ 85, Def. Resp. PSF ¶ 85. On that withdrawn paperwork, when asked whether she was able to work, Plaintiff answered yes, and when asked whether she was available to work, she answered no, explaining at some length how her condition limited the duties she could perform. Asked to explain how she was still able to work with her illness, injury, or disability, she wrote: "I am not sure how to answer this. Yes and no. It depends on the scope of the duties. I think I can probably perform simple duties like ticket taping or swiping library cards for a couple of hours a day at this stage in my cancer journey," and went on to describe her symptoms. She gave October 17, 2022 as the first date she was not available because of her illness, and September 22, 2023 as the date she expected to be available for work. DSMF ¶ 38, 41.

Asked about the September return-to-work date at her deposition, Plaintiff testified that her final chemotherapy had been on April 27, that patients are told to wait four to six weeks afterwards, and that she accordingly hoped to return in about May or June, "so it was kind of yes and no." ECF No. 55-2, Carpenter Dep. at 28–29., P. Resp. DSMF ¶ 40. Plaintiff said the September date came from what her doctors had advised and that "again, with cancer it could have been sooner. Based upon the surgery dates, it could have been sooner." DSMF ¶ 39, ECF No. 55-2, Carpenter Dep. at 29. Counsel then put to her that it might instead have been later and characterized the return date as "very indefinite," and the transcript records her answering, "You're absolutely right." ECF No. 55-2, Carpenter Dep. at 29.

On May 18, 2023, Plaintiff applied for Social Security disability benefits, as her long-term disability carrier required. DSMF ¶ 40, PSF ¶ 97, Def. Resp. PSF ¶ 97. The application was approved on September 30, 2023, and the Social Security Administration found her disabled as of August 21, 2023. Monthly payments began in February 2024, and she was still receiving them when deposed on April 20, 2024. DSMF ¶¶ 42–43. Defendants assert that Plaintiff claimed in the Social Security benefits application that she was unable to function and/or to work in any capacity as of October 17, 2022. DSMF ¶ 41. Plaintiff denies that the cited pages support that claim. Pl. Resp. DSMF ¶ 42. By the Court's reading, they do not support the claim outright, beyond the premise that a work disability request, arguably, implicitly concedes that an applicant is currently unable to perform work functions. ECF No. 55-3 at 28–41. The Court addresses this conflict in the record more fully *infra*.

On June 26, 2023, Plaintiff underwent surgery, and testing on August 10, 2023 indicated that she was cancer free. She then began immunotherapy to suppress recurrence. PSF ¶¶ 106–107, Def. Resp. PSF ¶¶ 106–107.

Plaintiff applied for numerous positions from August 2023 onward and used her carrier's return-to-work and vocation programs. PSF ¶¶ 108, 117, 121, Def. Resp. PSF ¶¶ 108, 117, 121. On March 6, 2024, Plaintiff's oncologist certified to New York Life that Plaintiff could not return to work with or without accommodations, and offered June 30, 2024 as the earliest estimated return date. DSMF ¶ 44. Plaintiff underwent further surgery in May 2024, which Defendants describe as "cancer/related surgery as late as June 2024" and Plaintiff describes as necessary to correct issues caused during her earlier surgery. DSMF ¶ 45, Pl. Resp. DSMF ¶ 46, PSF ¶¶ 124, 130.

Defendants assert that Plaintiff's oncologist did not clear her to return to work in any capacity until August 15, 2024 and that her psychiatrist did not clear her until September 1, 2024. DSMF ¶ 46. Plaintiff disputes that the cited document supports this conclusion. Pl. Resp. DSMF ¶ 47. The document is a letter from New York Life Group Benefits Solutions stating: "After completing our review of your claim, we are unable to continue paying benefits beyond August 31, 2024." ECF No. 55-3 at 75. It does not on its face establish the clearance dates Defendants attach to it, and those dates are not stated consistently. Defendants' Concise Statement gives the oncologist clearance date as August 15, 2024, while their supporting brief gives it as August 13, 2024, citing that same paragraph.

Defendants have admitted Plaintiff's assertions that: after her recovery she told New York Life that she was ready to return to work and asked that the benefits end; that the benefits ended on August 31, 2024; that she found work through the Social Security Administration's Ticket to Work program, and; that she now works full time and receives neither long-term nor Social Security benefits. PSF ¶ 131–133; Def. Resp. PSF ¶¶ 131–133. The insurer's letter sits in

some tension with Plaintiff's account of who brought the benefits to an end, but the end date and Plaintiff's present full-time employment are undisputed.

On December 15, 2023, Plaintiff sued Defendants in the Court of Common Pleas of Allegheny County, bringing claims for Retaliation, Disability Discrimination, Failure to Accommodate under the Americans with Disabilities Act (the "ADA") and the Pennsylvania Human Relations Act (the "PHRA"), Age Discrimination under the Age Discrimination in Employment Act (the "ADEA") and the PHRA, and Race and Color Discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and the PHRA. On January 9, 2024, Defendants timely removed, bringing the action to this Court. ECF No. 1. On February 20, 2024, Plaintiff filed an Amended Complaint (ECF No. 14). On January 15, 2026, Defendants filed a Motion for Summary Judgment (ECF No. 51), along with a Brief in Support (ECF No. 52) and a Concise Statement of Material Facts (ECF No. 53). On March 3, 2026, Plaintiff filed a Brief in Opposition (ECF No. 66) to the Motion, along with a Response (ECF No. 58) to Defendants' Concise Statement of Material Facts and a Counter Statement of Facts (ECF No. 59). On April 13, 2026, Defendants filed a Reply Brief (ECF No. 69) to Plaintiff's Brief in Opposition, along with a Response (ECF No. 70) to Plaintiff's Counter Statement of Facts. On April 29, 2026, Plaintiff filed a Sur-Reply (ECF No. 73) to Defendants' Reply Brief.

## II. Legal Standard

Summary judgment may be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

"The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact." *Bavone v. Primal Vantage Co., Inc.*, No. 2:21cv1260, 2024 WL 756815, at *1 (W.D. Pa. Feb. 21, 2024). When the moving party carries this burden, the summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Further:

> A non-moving party may not successfully oppose a summary judgment motion by resting upon mere allegations or denials contained in the pleadings, or by simply reiterating those allegations or denials in an affidavit. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Rather, the non-moving party must offer specific evidence found in the record that contradicts the evidence presented by the movant and indicates that there remain relevant factual disputes that must be resolved at trial. See id. If the non-moving party does not respond in this manner, the court, when appropriate, shall grant summary judgment. Fed. R. Civ. P. 56(e).

*Mahaven v. Pulaski Twp.*, 139 F. Supp. 2d 663, 664–65 (W.D. Pa. 2001), *aff'd*, 45 F. App'x 155 (3d Cir. 2002); *see also Bavone*, 2024 WL 756815, at *1 ("Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.").

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998).

The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a *material fact*, that is, a fact that would affect the outcome of the suit under the governing substantive law, will preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248.

## III. Discussion

Plaintiff brings claims under Federal anti-discrimination statutes and the corresponding provisions of the PHRA. The Third Circuit Court of Appeals has held that "the interpretation of the PHRA is identical to that of federal anti-discrimination laws." *Willis v. UPMC Child.'s Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015). Accordingly, because Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts," the Court addresses the Federal claims in the order the Parties briefed them, while allowing the PHRA claims to travel with them. *Kelly v. Drexel U.*, 94 F.3d 102, 105 (3d Cir. 1996).

### A. Failure to Accommodate under the ADA (Count I) and the PHRA (Count IV)

Defendants move for summary judgment on the Failure to Accommodate claim, arguing that Plaintiff is not a qualified individual as a matter of law, because the accommodation she sought, work leave, was indefinite, and an indefinite leave is never a reasonable accommodation. Plaintiff responds that she asked for a defined six-month period of leave, with an identified end date supported by a documented treatment plan, and while the estimated end date left open the possibility of complications extending it, that does not make the return-to-work date indefinite. She further argues that a reasonable jury could find that Defendants failed to engage in the interactive leave request process in good faith.

To establish an ADA claim, a plaintiff must show that "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the

job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (internal quotations and citations omitted) "Discrimination under the ADA . . . includes failing to make reasonable accommodations for a plaintiff's disabilities." *Id.* "[A]n employer discriminates when it does not make reasonable accommodations to the known physical or mental limitations of the individual unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer." *Twillie v. Erie Sch. Dist.*, 575 F. App'x 28, 32 (3d Cir. 2014) (cleaned up). Accordingly, "[t]he elements specific to the failure to accommodate disability discrimination claim are: (1) the employee had a disability; (2) the employer knew of that disability; (3) the employee can perform the essential functions of his job with a reasonable accommodation; and (4) the employer failed to provide an accommodation." *Sharbaugh v. W. Haven Manor, LP*, No. CV 14-1723, 2016 WL 6834613, at *9 (W.D. Pa. Nov. 21, 2016). Whether a proposed accommodation is reasonable is ordinarily a question of fact. *Buskirk v. Apollo Metals*, 307 F.3d 160, 170 (3d Cir. 2002).

In the case at bar, Defendants assert that Plaintiff's leave request was not a "reasonable accommodation" because it was open-ended and indefinite. Defendants cite *Fogleman v. Greater Hazleton Health* to establish that an "[o]pen-ended leave is inherently unreasonable." *Fogleman v. Greater Hazleton Health All.*, 122 F. App'x 581, 586 (3d Cir. 2004). In that case, the Third Circuit Court affirmed the district court's judgment as a matter of law, holding that "a request for time off from work does not constitute a reasonable accommodation," at least on the record before the court. *Id.* at 585. The reason the court gave, however, was that the plaintiff did not "identify record evidence that specifies the duration of the requested leave. There is no

evidence that permits any conclusion other than that the requested leave was for an indefinite and open-ended period of time." *Id.* at 586. The court there drew the contrast between the facts in that case and the sort of evidence before this Court here, where "the plaintiff offered evidence that her leave would be temporary, allowing her doctor to design a treatment program that would eventually enable her to return to work." *Id.* at 585 (citing *Criado v. IBM Corp.*, 145 F.3d 437, 444 (1st Cir.1998)). This contrast has been drawn more recently in *Wilson v. Children's Hospital*, where the Third Circuit Court affirmed summary judgment where the plaintiff "never provided [the employer] with an anticipated return-to-work date . . . [and] did not communicate with any [employer] personnel." *Wilson v. Child.'s Hosp. of Philadelphia*, No. 23-3223, 2024 WL 4490601, at *1–2 (3d Cir. Oct. 15, 2024). The remaining authorities that Defendants gather are to the same effect and rest on the same absence of proof. *See Brangman v. AstraZeneca*, LP, 952 F. Supp. 2d 710, 723 (E.D. Pa. 2013) ("There is no evidence that [the plaintiff's] leave would have been temporary").

And indeed, this is not an oversight by Defendants, but rather the crux of their argument. They contend that Plaintiff did not provide a definite end date. Unfortunately for Defendant's argument, the record here supplies evidence that Plaintiff provided a particular return-to-work date, something the plaintiffs in *Fogleman* and *Brangman* lacked. Defendant argues that this evidence shows a mere estimate, because the oncologist's office informed Conley that complications could change Plaintiff's ultimate return-to-work date. But as Judge Conti put it in *Sharbaugh*, "No medical professional can foresee the exact day on which a patient will be recovered. No medical professional can know whether there will be complications or delays with a patient's recovery, especially before surgery is even performed. That, however, does not

render [the plaintiff's] leave request indefinite and open-ended, as a matter of law." *Sharbaugh*, 2016 WL 6834613, at *14.

Further, Defendant's own policy asks only for an anticipated return-to-work timeframe and an ongoing treatment plan. If a time estimate for leave for cancer treatment that might be disturbed by complications is definitionally indefinite, then no request for medical leave for a serious illness could ever qualify, and the ostensible accommodation would be a nullity in precisely the circumstances where it matters most. No authority Defendants cite adopts such an absurd rule.

On the record before the Court, there is more than enough for a jury to determine whether Plaintiff's leave request was temporary or indefinite. The requested leave had a defined six-month term, at least to the degree than any serious illness can be said to have such parameters. Conley acknowledged that he did not doubt that Plaintiff could take six months to complete her recovery, and knew that a treatment plan was in place and that the September end-date tracked that timeline. He did not consult with the WorkPartners team that tracked foreseeability of leave, but the grievance reviewer who did investigate explained that she did not understand why the September return-to-work date was deemed not foreseeable.

Defendants' reliance on what happened after Plaintiff's termination in April 2023 does not change the analysis, and for the very reasons some of their cited authorities supply. "The determination of whether an individual with a disability is qualified is made at the time of the employment decision, and not at the time of the lawsuit." *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604 (3d Cir. 2006) (citing *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)). The question is what Defendants knew and could have reasonably expected as of April 2023, not how long Plaintiff's recovery actually took.

Defendants' line of cases holding that an employer may rely on a treating physician's stated work limitations does not sway the Court either. Defendants argue that an employer may take a treating physician's stated limitations resulting from the disability at face value and accommodate accordingly, and therefore an employer may equally rely on a physician's statement that no accommodation is available. On Defendants' characterization of the record, Plaintiff's physician said as much when her office described the September return-to-work date as an estimate and explained that surgery, chemotherapy, and immunotherapy, all of which come with potential complications, still lay ahead.

The first half of Defendants' argument, that an employer may take a doctor's limitations at face value to accommodate an employee, is not objectionable. The second half, that therefore an employer can do the same when denying accommodations, does not follow, particularly so here, because Plaintiff's physician did not say no accommodation was available to Plaintiff. On the contrary, she completed Defendants' form and requested six months of the accommodation their policy provided. Defendants did not take that response at face value. They declined to credit it in their decision-making.

A reasonable jury could also find that Defendants did not engage in the interactive process in good faith. To establish a failure to participate in the interactive process, an employee must show that "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 319–20 (3d Cir. 1999) (citing *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997)). "[W]here there is a genuine dispute about whether the employer

acted in good faith, summary judgment will typically be precluded." *Id.* at 318. Conley recommended against job protection on April 3, 2023, the same day he received the form and three days before he called the physician's office. By the time he made that call, he had already told Nan and Williams that Plaintiff had provided no foreseeable return-to-work date. The following day, Williams reported that Plaintiff would no longer be an employee as of April 18. When Conley finally did call the oncologist's office, he reported back to HR and the legal team that hopefully the nurse's confirmation that Plaintiff may face complications was the clarification they were hoping for to end Plaintiff's job protection. A factfinder could easily read that sequence of events as a decision followed by a half-hearted inquiry to retroactively justify it, and not a good-faith effort to engage in the interactive process. The record does not show that anyone told Plaintiff about deficiencies they perceived in her submissions, solicited clarifications, or proposed how to reasonably cure the deficiencies. During Plaintiff's two calls with Conley when she asked about returning to work, he referred her to long-term care without mentioning that her employment was about to end. Defendants answer only that Conley was not the decisionmaker and it would have been improper for him to inform her. That may explain why he was not forthright with Plaintiff during the course of the interactive process, but it does not explain why nobody was.

Accordingly, as to the Failure to Accommodate claims in Counts I and IV, the Motion for Summary Judgment will be denied.

**B. Disability Discrimination under the ADA (Count I) and the PHRA (Count IV)**

Defendants move for summary judgment on the Disability Discrimination in the Discharge claims in Counts I and IV, arguing that they fail for the same reason as the Failure to Accommodate claim, namely, that Defendants had a legitimate reason to terminate Plaintiff

because she had requested indefinite leave. Defendants argue further that Plaintiff is judicially estopped from pursuing this claim by what she told New York Life, the unemployment compensation authority, and the Social Security Administration. Plaintiff responds that the evidence shows that Defendants knew her to be a qualified individual but denied her rights anyway, with the pretext that she had no foreseeable return date, and that the estoppel argument fails because Defendants have not identified inconsistencies in Plaintiff's benefits applications and her claims in the present lawsuit.

Under the ADA, an employer is prohibited from discriminating against an employee based on disability. 42 U.S.C. § 12112(a). To establish a *prima facie* case of discrimination, a plaintiff must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). A plaintiff is a "qualified individual" under the ADA if she has a disability and, "with or without reasonable accommodations, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Once a plaintiff has established this *prima facie* case, the burden "shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008). If the defendant articulates a legitimate reason for the adverse employment action, the burden shifts again to the plaintiff to show that the legitimate reason is a pretext for discrimination. This is the burden shifting scheme established under *McDonnell Douglas Corp v. Green* for ADA claims. 411 U.S. 792 (1973). At summary judgment, if the first two steps of the burden shifting scheme have been met, the plaintiff bears

the burden of meeting the final step of establishing pretext in order to survive summary judgment. *See, e.g.*, *Zimmerman v. Health Network Laboratories, L.P.*, 2025 WL 457100 (E.D. Pa. Feb. 10, 2025); *see also Reynolds v. Willert Mfg. Co., LLC*, 567 F. Supp. 3d 553 (E.D. Pa. 2021).

In Section III.A of this Memorandum, the Court explained that on the evidentiary record before it, a jury could find that Plaintiff's six-month leave request was a reasonable accommodation. If a jury does so find, then it could also find that Plaintiff was a qualified individual under the ADA, because the record shows that with this accommodation, she could have performed her essential work functions.

Defendants' proffered reason for the discharge, that Plaintiff had no foreseeable return-to-work date, satisfies their burden of production under the second step of *McDonnell Douglas*. The question remains as to whether this was a pretext. To survive summary judgment, Plaintiff must now show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531 (3d Cir.1992)).

Similar to the Court's analysis respecting bad faith in the interactive process, many of the details as to how Defendants engaged with Plaintiff's provided information could be interpreted by a fact finder as discriminatory. The denial letter told Plaintiff that her request failed because she lacked a confirmed return-to-work date, and this was internally recast as no *foreseeable* return to work date. This shift, from confirmed return date to foreseeable return-to-work date, seems designed to change the meaning of Plaintiff's reason for the accommodation to fit

Defendants' written policy, which asked for an anticipated return timeframe rather than a confirmed and specific date. A jury could find that Plaintiff provided a reason consistent with Defendants' policy and Defendants initially interpreted it as such, only to reinterpret the meaning of her reason to apply a discriminatory standard. After receiving Plaintiff's and her doctor's reason for the accommodation, Conley recommended against job protection, hoping that his recasting of Plaintiff's reason was the excuse the HR and legal departments were hoping to get. Cristina Corigliano, the grievance reviewer, drafted a note articulating the discriminatory policy that replaced the written policy, sidestepping what Defendants' claim their policy is (sick leave for those with an approximate return date) for their actual policy (no sick leave for more than six months). Corigliano testified that she did not understand why the September return-to-work date was not foreseeable but still wrote that she did not want to set a precedent where an employee can take off work for six months. A jury could find that Defendants' proffered non-discriminatory reason for Plaintiff's discharge was not the operative one, and that what actually governed was an unwritten practice of ending employment for employees whose illness takes them away from work for six months.

Defendants next argue that Plaintiff is estopped from advancing her Disability Discrimination claim because she told her long-term disability carrier and the Social Security Administration that she could not work and testified that those applications were answered truthfully. As Defendants put it, Plaintiff bears the burden of producing evidence sufficient to explain the inconsistency between what she said when seeking benefits and what she says now in

advancing this case. Because she has offered none, posit Defendants, the claim fails as a matter of law.[1]

The United States Supreme Court has found that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim. Nor does the law erect a strong presumption against the recipient's success under the ADA." *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 797 (1999). However, a plaintiff "cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim" and "must proffer a sufficient explanation," one "sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." *Id.* at 806–07 (internal quotation marks omitted). In *Turner*, the Third Circuit Court of Appeals applied that same framework to statements made in the long-term disability application contexts. *Turner*, 440 F.3d 604. There, the Third Circuit Court reversed summary judgment, and *Fogleman* articulated the same, finding that a plaintiff's assertions in a "workers' compensation claim does not preclude a finding that she is a qualified individual for purposes of her ADA claim," but she must offer "evidence regarding how she could nevertheless perform the essential functions of her job with or without accommodation." Fogleman, 122 F. App'x 581 n.9 (citing *Cleveland*, 526 U.S. at 799 *and Motley v. N.J. State Police*, 196 F.3d 160, 164–65 (3d Cir. 1999)). Accordingly, the Court examines the statements Plaintiff made during her various applications to weigh the evidence of contradictions or lack thereof.

[1] A word on Defendants' label: Defendants advance an argument that they describe as "judicial estoppel." From the Court's reading, what they actually articulate is the *Cleveland* explanation requirement. Judicial estoppel proper requires (1) two positions that irreconcilably inconsistent and (2) a bad faith change in position. *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779–80 (3d Cir. 2001). Defendants do not advance a bad faith argument, but the Court will treat this as a mere mislabeling of the argument rather than defeated for lack of evidence of bad faith.

The Court first endeavors to articulate what positions Plaintiff does and does not take in these proceedings, to more clearly analyze whether they are contradicted by her previous positions as reflected in the record. Plaintiff does not contend that she could have performed her Project Analyst duties in April 2023 when Defendants terminated her employment. In fact, her inability to return to work at that time is the premise of her claim, rather than an admission that runs against it. The very accommodation she requested was leave because she was not cleared to return to her job. But her contention is narrower than Defendants treat it. She also did not claim that six months of leave would have in fact returned her to work. Instead, she claimed that the leave her doctor requested of six months ending on September 24, 2023 was, on the medical information then available, a definite and temporary measure that would have returned her to the essential functions of her Project Manager positions, and as such, she was a qualified individual whose request was entitled to consideration. To the degree, or within the terms, that each particular application form asked if she could work, Plaintiff answered that she could not, and by the Court's reading of the record, she did so in good faith. The remaining question is whether anything she told an insurer or agency contradicts her contention that leave until September 2023 would have returned her to her position. But importantly, her representations to New York Life and the Social Security Administration were forecasts based on present-tense impressions that are not necessarily falsified by the actual eventual recovery length.

Defendants' brief does not explain which of Plaintiff's statements contradicts which of her present contentions, and so the Court draws the inconsistencies it can glean from the record. First, Plaintiff received long-term disability benefits under a plan that pays employees who are *unable to perform the material duties of their occupation*. Second, on an unemployment form, Plaintiff represented that she was unable to work and did not expect to be able to until September

22, 2023. And third, to support her Social Security application, Plaintiff claimed she was unable to function or work in any capacity and identified numerous physical and mental limitations. Plaintiff received Social Security benefits at least until her deposition in this matter in April 2024.

As to the long-term disability application, New York Life's policies define disability as being "unable to perform . . . the duties of the occupation as it is normally performed in the general labor market in the national economy," and expressly excludes "work tasks that are performed for a specific employer or at a specific location." PSF ¶ 70, Def. Resp. PSF ¶ 70. The representations Plaintiff made under that definition were statements that she could not perform her occupation as it is generally performed, measured without regard to the work she did for Defendants. The ADA, the statute under which Plaintiff's claims are evaluated in the case at bar, asks whether she could perform the functions of her particular job with reasonable accommodations. An employee may truthfully answer no to the New York Life question and yes to the ADA question. In fact, that is a common posture of an ADA plaintiff.

The unemployment paperwork also does not contradict her current position. The September 22, 2023 date Plaintiff provided in that paperwork was not, as Defendants characterize it, a sworn statement that Plaintiff was unable to return to work until that date. Instead, when asked whether she was able to work, Plaintiff answered yes, and when asked to explain how she could still work with her illness, Plaintiff may be reasonably considered to have provided a nuanced answer that explains her specific limitations and asserted that her ability to work would depend on the scope of her duties. The September 22, 2023 date was simply providing the timeframe her physician had offered as to when she could return to work. So, in Plaintiff's unemployment form, she records that she could not at that time perform the functions

of her particular job, which she maintains in this action, and that at the time she expected to be able to work again in late September, which is not contradicted by anything on the record. The fact that Plaintiff elsewhere listed September 24, 2023 as her estimate return-to-work day does not show that the date she chose was an arbitrary moving target invented for convenience. It was a two-day difference, which is easily explainable as a minor memory lapse or reflective of the choice of a specific date from inside a return window provided by her doctor.

The Social Security application supplies no contradiction either. Plaintiff applied for Social Security benefits on May 18, 2023, because New York Life required her to do so as a condition of her long-term benefits. In the materials submitted with her application, the record does not show that she claimed she could not work or that she would return to work in September 2023. It does show that she claimed that she did not yet work as of the time she submitted the paperwork in 2023 and that she expected to work in 2024. Defendants claim that in her application, Plaintiff represented that she was unable to work or function in any capacity as of October 17, 2022. The Court rejected this contention *supra*.

*Krensavage v. Bayer*, the only authority Defendants cite for the estoppel argument, involved representations markedly different from the kind Plaintiff made here. *Krensavage v. Bayer Corp.*, No. 02:04CV1476, 2006 WL 2794562 (W.D. Pa. Sept. 27, 2006), *aff'd*, 314 Fed. Appx. 421 (3d Cir. 2008). There, the plaintiff submitted a physician's opinion that she was "totally and permanently disabled from any and all work." *Id.* at *4. The plaintiff agreed with that opinion during her deposition. *Id.* at *10. A representation in those terms leaves nothing for the statutory accommodation to operate on, because an employee who cannot and can never perform any work at all, permanently, inherently cannot perform the essential functions of a position, regardless of accommodation. The inconsistency there was thus inherent to the scope

of the cause of action, and it did not depend on what her particular job required. Here, Plaintiff asserted a time-limited inability, gave an expected return date supplied by her physician, received benefits, and has since returned to full-time employment. The two factual contexts are not comparable.

On the current record, none of Plaintiff's representations is inconsistent with her position in this litigation. Defendants are therefore not entitled to summary judgment on the basis that Plaintiff's purported inconsistent representations estop her claim. Accordingly, as to the Disability Discrimination claims in Counts I and IV, the Motion for Summary Judgment will be denied.

**C. Retaliation under the ADA (Count I) and the PHRA (Count IV)**

Defendants move for summary judgment on the Disability Retaliation claims in Counts I and IV, arguing that it rests on the denial of an accommodation, making this essentially a circular repackaging of the Failure to Accommodate claim. Defendants argue further that Plaintiff cannot show causation or that the timing is unusually suggestive. Plaintiff responds that the adverse action was her discharge, not merely the denial of an accommodation, and the timing of the discharge and the surrounding conduct permit an inference of retaliation.

"To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). A causal connection between the exercise of a protected right and the adverse action can be established in one of two ways: (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of

antagonism coupled with timing to establish a causal link. *Lauren v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). "The right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC, and we have already explained that the ADA protects one who engages in the latter activity without regard to whether the complainant is disabled." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759 n.2 (3d Cir. 2004) (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003) (internal quotation marks omitted).

Defendants' circularity argument, that a denial of an accommodation cannot be considered retaliation for the protected activity of requesting the accommodation, rests on three Eastern District of Pennsylvania decisions that address facts where the only adverse action alleged was the denial of an accommodation. Here the adverse action was Plaintiff's discharge. Accordingly, while persuasive decisions from the esteemed judges in the Eastern District are available to this Court, the particular cases cited by Defendants do not fit well here.

On the question of timing, the record shows that Conley received the completed attending physician statement on April 3, 2023, that he recommended stripping Plaintiff of her job protection that same day, and Plaintiff was terminated less than four weeks later. Defendants argue that this timing is not unusually suggestive to establish a causal connection, but the authority they cite sets the boundary at no longer than a month. *Yu v. U.S. Dep't of Veterans Affairs*, 528 Fed. Appx. 181, 185 (3d Cir. 2013).

Furthermore, Plaintiff does not rest the unusually suggestive element of her Retaliation claim on timing alone. The same evidence that established pretext in her Disability Discrimination claim supports the causal inference. The recommendation was made before any inquiry. Plaintiff's lack of confirmed return-to-work date was recast as there being no

foreseeable timeframe for her return. The inquiry was, arguably, reframed to fit what the more senior decision makers were hoping to hear. And the grievance notes applied a six-month policy to avoid setting a precedent rather than the written policy that prescribed an individualized assessment. A fact finder can find that these facts suggest a pattern coupled with timing to establish a causal link, in *Lauren* parlance. *Lauren*, 480 F.3d at 267. Accordingly, as to the Retaliation claims in Counts I and IV, the Motion for Summary Judgment will be denied.

**D. Age Discrimination under the ADEA (Count II) and the PHRA (Count IV)**

Defendants move for summary judgment on the Age Discrimination claims in Counts II and IV, arguing that Plaintiff provided no evidence that age motivated the discharge, that the comparators she cites are not similarly situated, and that she cannot show pretext. Plaintiff responds that she was replaced by a substantially younger employee and that the fact that Defendants engineered an excuse to deny her benefits creates an inference of age discrimination.

"The elements of a prima facie case of age discrimination are that: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive." *Willis*, 808 F.3d at 644 (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013)). The ADEA also requires the plaintiff to establish that age was the but-for cause of the adverse action. *Id.*

Here, the prima facie case is satisfied, or, for present purposes, it is assumed.[2] However, the claim fails at the but-for cause test. Plaintiff testified that during her time as an employee of

[2] The fourth element is the most contentious, and it turns on whether Kristie Mak did in fact replace Plaintiff. Mak was hired as a project analyst on April 4, 2023, one day after Conley recommended ending Plaintiff's job protection. Plaintiff also points out that UPMC HVH only has around twenty-five employees and that Mak was the only new

Defendants nobody ever said anything to suggest age bias. The documents that memorialize the internal decision-making conducted by Defendants never mention age. Furthermore, Williams, who was the one who accepted Conley's recommendation to deny Plaintiff's extended leave request, was also the one who had hired her in the first place, which makes it less likely that a trait that was visible when Plaintiff was hired was also the trait that led to her discharge.

To establish comparators, Plaintiff points out that Malito, Patterson, and Williams each took leave and were allowed to return. However, they took leave and then returned to work without seeking extension of their leave as an accommodation. Plaintiff, on the other hand, exhausted her FMLA leave and then sought another six months. This establishes a difference in the employee's conduct or request, not a difference in treatment. Plaintiff also does not provide information about the length of Malito's and Patterson's leave, or whether either was unable to give a particular firm return date. As Plaintiff's own supervisor and as someone whose age is not in the record, Williams is also not a suitable comparator.

The pretext evidence that the Court relied upon in the previous analyses does not carry over to this claim. A plaintiff may defeat summary judgment in an age discrimination claim by showing that the employer's stated reason is unworthy of credence, because "the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765. But the ADEA requires that age be the but-for cause, and evidence from which a jury can infer animus of one kind does not establish but-for cause for another. In short, the inference the fact finder is permitted to draw from evidence of pretext must still be an inference of the particular discrimination alleged. Here,

---

project analyst listed on its website around that time. Williams testified that Mak did not assume any of Plaintiff's duties, work on her projects, or take her position. If a jury resolves that dispute in Plaintiff's favor, the age gap is not in doubt. A twenty-six year-old replacing an employee over fifty is sufficiently younger to support an inference of discriminatory motive.

as the Court has noted *supra*, several facts provide ample evidence from which a jury can infer pretext, but it is not pretext of age discrimination, but rather disability discrimination.

Plaintiff's response relies on the assertion that a jury could infer that Defendants did not want to retain an older employee with a history of disabilities. The disability half of that argument is supported by the record, but the age discrimination is not. If a jury was tasked with evaluating this evidence to find that age was the but-for cause of Plaintiff's discharge, it would have to speculate. Accordingly, as to the Age Discrimination claims in Counts II and IV, the Court will grant summary judgment.

**E. Race and Color Discrimination under Title VII (Count III) and the PHRA (Count IV)**

Given that this analysis is a significant retread of topics covered, the Court's treatment will be brief. The establish a *prima facie* case for Race and Color Discrimination, a plaintiff must show that "(1) he is a member of a protected class; (2) he was qualified for the position he sought to attain or retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Qin v. Vertex, Inc.*, 100 F.4th 458, 473 (3d Cir. 2024) (quoting *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)) (cleaned up). The fourth element may be established by evidence of comparators or by circumstantial evidence otherwise showing a causal nexus between protected status and the adverse action. *Shealey v. Pittsburgh Mercy Health Sys., Inc.*, No. 2:23-CV-01511-CCW, 2025 WL 327310 (W.D. Pa. Jan. 29, 2025). Comparators must be similarly situated in all relevant respects. *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222–23 (3d Cir. 2009).

Plaintiff identifies Malito, Patterson, and Williams as comparators, each from outside her protected class and who took medical leave and returned. That evidence fails for the same reason it did under the EDEA analysis. Each took a leave and returned without requesting an extension of leave, which is distinguishable from Plaintiff's conduct. Plaintiff also does not provide the length of their leave or whether they provided firm return-to-work dates to establish reasonable comparisons. By the Court's reading of the Parties' submissions, these comparators' races are not recorded in evidence.

Plaintiff also argues that the hiring of Kristie Mak, who self-identifies as Asian, could give rise to an inference of intentional discrimination. If a jury finds that Mak did in fact replace Plaintiff, the *prima facie* case is satisfied for *McDonnell Douglas* framework purposes, and Defendants have articulated a non-discriminatory reason for the adverse action. The burden now shifts back to Plaintiff to establish pretext. Plaintiff testified that nobody said anything to her to suggest racial bias, and the contemporaneous records that show the decision-making process do not show any evidence of racism or racial bias. The evidence that Defendants' stated reason for its treatment of Plaintiff is unworthy of credence is substantial, but it points toward disability discrimination. Nothing in the record would allow a fact finder to attribute the discharge to race or color. Accordingly, as the Race and Color Discrimination claims in Counts III and IV, the Court will grant the Motion for Summary Judgment.

## IV. Conclusion

For the reasons discussed above, Defendant's Motion for Summary Judgment will be granted in part and denied in part. An appropriate Order of Court follows.

BY THE COURT:

*/s/Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: September 29, 2026

cc: All counsel of record